Filed 8/12/22  P. v. Smith CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D079229 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. FSB18001339) |
| TERIN JANAE SMITH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Harold T. Wilson, Jr., Judge.  Affirmed in part; reversed in part; remanded with directions.

Susan S. Bauguess, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal, Andrew Mestman, and Minh U. Le, Deputy Attorneys General, for the Plaintiff and Respondent.

A jury convicted Terin Janae Smith of aid by misrepresentation over $950 (Welf. & Inst. Code, § 10980, subd. (c)(2); count 1) and 95 counts of

perjury by declaration (Pen. Code,[1] § 118; counts 2-96). The court suspended the imposition of her sentence and placed Smith on five years formal probation, conditioned on her serving 365 days in county jail on a weekend/work release program. She received credit for two days. In addition, Smith was ordered to pay attorney fees in the sum of $700, a presentence report fee of $250, probation supervision fees at $45 per month, criminal conviction and court operations fees of $140, and a restitution fine of $300. The court subsequently modified Smith's probation period to three years.

Smith appeals, contending: (1) the trial court erroneously admitted her pretrial interview in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*); (2) substantial evidence does not support her convictions; (3) the trial court erred in denying her motion for a new trial based on prosecutorial misconduct; (4) the trial court violated section 654 by imposing concurrent terms for counts 2 through 96; (5) her probation term should be reduced to two years under Assembly Bill No. 1950; and (6) certain fees should be vacated following Assembly Bill No. 1869.

As the People concede, we agree that Smith's probation term should be reduced to two years and certain fees that are unpaid as of July 1, 2021, must be vacated. In all other respects, the judgment is affirmed.

FACTUAL BACKGROUND

Prosecution

In 2017, Smith had three minor children. Her eldest child's father is Kevin M. Smith and Kevin ended their relationship nine months after their son was born and were not in a relationship in 2017. Kevin's father was the pastor at a church (church) in San Bernardino. Kevin's mother, Cynthia M.,

---

[1] Statutory references are to the Penal Code unless otherwise specified.

was the "first lady" of the church and her responsibilities included running the "women's department." Cynthia cared for Smith's two children for five or six years and began caring for Smith's third child in 2017. The father of Smith's two younger children is J.G. J.G. lived with Smith until he moved out in February 2017.

According to an employment service specialist (specialist) from San Bernardino County, "Welfare-to-Work is a program that when a family receives cash aid, we try to get them back to self-sufficiency. Depending on the family structure and the children's age, they have certain hourly requirements to meet." Because she was a single parent with children under six years of age, to receive cash aid, Smith was required to fulfill 85 hours a month, or 20 hours a week, of activities that may include employment, community service, and vocational education.

For employment, the work schedule is determined by the employer. If Smith worked a schedule different than what was on her contract, she was required to submit an update to her Welfare-to-Work contract, even if the employer agreed to the different schedule. For example, a contract could be updated "to do variable hours" and the specialist would require updated forms. Smith was likewise required to report a change in her employment location. Reporting a location change was to Smith's benefit because the employment location is used to determine her transportation assistance benefit. A change in Smith's work address would not disqualify her. Rather, it would result in a change to the support she received. The information provided by a welfare recipient like Smith is material to her continuing the program and her benefit amount or type.

As part of the Welfare-to-Work program, travel claims, childcare service forms, and self-employment records are signed under penalty of perjury.

On June 5, 2017, Smith met with a specialist to discuss her Welfare-to-Work contract for June 5, 2017, through May 31, 2018. According to her contract, Smith agreed to work at least 18 hours per week and provide two hours of community service per week. Smith informed the specialist that she continued to work at the apartment on West College Avenue. Smith indicated her employers were Emma S. and Montoya W. and her work schedule was Monday through Friday, from 2:30 p.m. to 8:00 p.m. As for her community service, Smith indicated that the church in Rancho Cucamonga had closed, and she was doing community service at the church's San Bernardino location. Her schedule for community service was after work, Monday through Friday, from 8:00 p.m. to 9:00 p.m. The specialist noted the church's change of location and submitted the update into the system.

The specialist explained Smith's rights and responsibilities under the contract. Smith confirmed she understood those rights and responsibilities and signed the contract.

After their meeting in June 2017, the specialist unsuccessfully tried to contact Smith's employer for verification. She called the numbers listed by Smith on file, but the calls were never answered. The specialist referred the case for a fraud investigation to verify Smith's employment, employment location, and community service location.

On December 15, 2017, Smith reviewed and submitted a one-month "continuing contract." Smith indicated her employment information in the system was still valid. She continued to work on West College Avenue, and

4

her schedule continued to be Monday through Friday, from 2:30 p.m. to 8:00 p.m. She also confirmed that she continued to do community service at the church in San Bernardino. Smith signed the contract that day.

On January 30, 2018, Smith met with another specialist to go over a new Welfare-to-Work contract for January 30, 2018 through May 31, 2018. Smith indicated her employment location and schedule was the same as previously reported. Instead of engaging in community service, however, Smith agreed to meet with a specialist at least once a week, search for a job at the Transitional Aid Office (TAD or welfare office) starting on February 5, 2018, and do up to 10 hours of "job search activity." Smith signed the new contract after acknowledging her rights and responsibilities. The specialist at that meeting contacted the fraud department because Smith was receiving childcare benefits while she worked as a nanny. The specialist requested verification of Smith's employment.

From February 2017 through January 2018, Smith received CalWorks benefits, travel reimbursement associated with her employment and community service, and childcare benefits. CalWorks "is a cash benefit that a recipient is entitled to if they have minor children who have a deprivation," including a parent's absence or unemployment. Welfare-to-Work is required for CalWorks benefits. Smith also received CalFresh benefits. CalFresh is a food assistance program that provides food stamps benefits to its recipients.

Smith was reimbursed a total of $4,916.40 for her travel claims from February 2017 through January 2018, which also included $87 for LiveScan.

Regarding childcare for Smith's three children, the county paid Cynthia a total of $29,497.44 from February 2017 through January 2018 for allegedly watching Smith's children.

5

After the specialist became concerned about possible fraud on behalf of Smith, a fraud investigator with the San Bernardino County Human Services Division went to the location Smith listed as her place of employment and learned that Montoya, who was Smith's friend and had known Smith for 10 or 15 years, no longer resided there. Montoya had lived at the Castle Park Apartments on West College Avenue in San Bernardino beginning on March 20, 2016, but she moved out of the apartment on January 26, 2017. Emma was not listed on Montoya's lease for the apartment.

On February 27, 2018, the investigator contacted Montoya, who came into the welfare office. Because Montoya also was receiving benefits, the investigator verified with Montoya that she was unemployed at the time as well as asking Montoya questions about Smith's employment. Montoya informed the investigator that she and Smith were friends, she did not employ Smith as a nanny, and she had never paid Smith to watch her children. Montoya also told the investigator that she had been evicted from her apartment on West College Avenue on January 26, 2017, and she moved to her grandmother's home in Rialto. In addition, Montoya lived with her sister in Victorville in 2017 and 2018. When the investigator asked Montoya whether Smith went to her home in Victorville, Montoya said she had not seen Smith since she moved to Victorville. According to Montoya, Smith watched Montoya's children 10 to 20 times and only at the apartment on College Avenue. In addition, Montoya never paid Smith because Smith watched her son "as a favor." Montoya reviewed the forms submitted by Smith and told the investigator that the signatures on the forms were not hers.

Montoya did not tell the investigator that she gave Smith permission to sign her name for her. Montoya did not tell the investigator that her grandmother paid Smith for watching Montoya's children.

However, the statements Montoya made to the fraud investigator differed somewhat from her testimony at trial. Montoya testified that the last time she saw Smith was about a month before trial. Montoya confirmed that by February 2017 and through January 2018, she lived "in between" her sister's home in Victorville and her grandmother's home in Rialto. Montoya did not know anyone by the name Emma. In contrast to her interview with the fraud investigator, Montoya testified that her grandmother paid Smith to "keep [her] kids" from February 1, 2017, through January 31, 2018.

As Montoya testified, according to the agreement among Montoya, her grandmother, and Smith, Smith was paid minimum wage and watched Montoya's children three to five times a week while Montoya took care of her grandmother who had a terminal illness. Montoya testified she did not remember telling the fraud investigator that Smith was not working as a nanny for her. She denied that she told the investigator she did not pay Smith to watch her children. According to Montoya, "there [were] a lot of discrepancies with [the investigator's] statement to what was actually told." When confronted with her pretrial statement that Smith only watched her children 10 to 20 times, Montoya explained that the number was only for the beginning of 2018. According to Montoya, the schedule that Smith watched her children varied week to week, and Smith did not watch her children every day, but when she did, Smith watched the children from three to eight hours at a time. Although she initially testified that Smith did not visit her when she was in Victorville, on cross-examination, Montoya testified that Smith also cared for her children at the Victorville and Rialto homes. When

7

confronted with Smith's employment verification and income verification forms, Montoya testified that she did not sign the forms dated November 3, 2016 and June 5, 2017, but had given Smith permission to sign her name for her.[2]

Smith's community service attendance forms for June 2017 through January 2018 indicated she provided cleaning services at the church, often in the morning or early afternoon, every Wednesday and Saturday. In the time period of June 2017 through January 2018, Smith's forms were signed by "Susie B[.]" and initialed with "SB" (except for June 2017).

The fraud investigator visited the church listed for Smith's community service on a Wednesday in late January 2018 between 11:00 a.m. and 12:00 p.m. but did not find anyone there. The investigator stated that the church was in a business center without any signage out front indicating it was a church. The doors were locked, but when he looked through the windows he could see items with the church's logo on them. No one answered the door when the investigator knocked. He then walked around the building and did not "find any other doors to that location."

On March 22, 2018, the fraud investigator contacted Susie T. regarding Smith's community service. Susie T. was Kevin's aunt and had known Smith for over 20 years. Susie T. was the executive secretary at the church and was responsible for signing community service verification forms. Susie T. told the fraud investigator that she had filled out forms in the past for Smith, but

---

[2]     Based on the self-employment verification forms submitted by Smith for February 7, 2017, through January 31, 2018, Smith worked at least an average of five hours a day, every Monday through Friday, except for Christmas day in 2017, which was a Monday.

she could not remember the last time that she had actually completed one. Susie T. informed the investigator that she used the name Susie T. in 2017 and 2018.

At trial, Susie T. testified that she had gone by the name Susie B. in 2016 and 2017 but that the signatures for Susie B. on the Welfare-to-Work attendance forms submitted by Smith for the months of July 2017 through January 2018 were not made by her. However, Susie T. testified that the signatures were "authorized signature[s]" and that several people who worked in the office during the day were authorized to "approve the community service that's being done at the facility when they are present." According to Susie T., the persons authorized to approve the community service forms included Lydia P., Vivian F., and Lee J. Susie T. knew those individuals were working during the week because she often called the number for the church and one of them answered the phone. When asked whether they were authorized to sign their own name, Susie T. testified, "They should have, but I see they didn't. So they were given my authorization to sign. Maybe they thought, if I said 'sign,' they thought they were authorized to sign my name." Nonetheless, Susie T. never authorized Smith to sign her name.

Susie T. acknowledged she was not present when the forms were signed and that she was not present when Smith did the community service unless Smith cleaned on Saturdays and Sundays, the only days Susie T. was present at the church. Although Susie T. testified that she observed Smith doing the community service "[f]requently" during the beginning of 2017 and to the end of January 2018, Susie T. acknowledged she only saw Smith during events in the parking lot on the weekends and Saturday outreach services and "never physically saw [Smith] during the week."

9

Regarding the name Susie B., Susie T. testified that after her marriage in 1989, "everyone call[ed] her B[.]" at church and her legal name also was "Susie P[.]" She always signed "[Susie T.] with a hyphen [B.]." Once she learned her husband was legally married to someone else, she stopped using his last name (B.). She confirmed she also went by the name Susie T.

For the period of February 2017 through January 2018, there were numerous instances of Smith using her EBT card in Rancho Cucamonga, Upland, or Ontario at the same time that she had declared she was working or doing community service in San Bernardino.[3] However, there were no EBT transactions in Rialto or Victorville.

On March 21, 2018, Smith talked with the fraud investigator at the welfare office. Smith confirmed that she was a nanny for Emma and Montoya. Smith told the investigator that she had never met Emma but was told that Emma was Montoya's grandmother. Smith then informed the investigator that Montoya moved to Victorville in the summer of 2017, but Smith did not report the move to the welfare department. Smith was paid in cash only because her days and hours of work varied. Smith did not tell the investigator that she had signed Montoya's signature on the employment forms.

Concerning verifying her community service, Smith said, "the forms had been signed by whoever she could find to sign those forms" and that "[m]ost of the time it was the church secretary." Smith subsequently admitted that she signed the forms herself. Smith did not tell the investigator that Susie T. gave her permission to sign Susie T.'s name on the

---

[3]    An EBT card is similar to a debit card; welfare benefits may be deposited onto a recipient's EBT card.

attendance forms. Although her forms indicated that she cleaned the church as community service, Smith told the investigator that she "does other work and that she is not always doing that at the church."

J.G., the father of Smith's two younger children, testified at trial. J.G. was convicted of felony second-degree robbery while in personal possession of a gun in 2000 and for felony possession of marijuana for sale in 2012. According to J.G., he moved out of the home he shared with Smith in the "[l]atter part of February" 2017, and he and Smith "were still intimate in later parts of [20]17." On February 24, 2017, Smith filed a petition against J.G. for full custody of their two children. Smith filed an action for child support on May 24, 2017. J.G. filed a petition for full custody on December 26, 2018.

J.G. testified that, in February 2017, he watched their children the "[m]ajority of that month" because Smith was on one of her "frequent vacations" and J.G. watched their two children by himself. In 2017, Smith went on three such trips, during which she had left for "approximately 20 some-odd days one time, 15 days another time." J.G. believed one trip was in February, another trip was during Easter, and the last trip was later on during the year.

Smith left for weeks on her vacations, and he was the only person watching their children. When Smith was home, J.G. watched their children when she needed a break or "whatever the case would be" because they were in an active relationship at the time. J.G. estimated that he watched their children about 39 percent of the time between February 2017 and January 2018. The schedule for when he watched their children varied, and, on several occasions, he also picked up Smith's eldest son. However, J.G. did not

pick up the children from Cynthia's home very often. When he did, he picked up Smith and the children after they played at Cynthia's home. The majority of the time when J.G. took Smith to the church was on a Sunday.

J.G. knew Cynthia was receiving money from the county to watch Smith's children while Smith was attending school online. He frequently observed Cynthia give childcare money to Smith, including at Cynthia's house, at the church, and at Smith's home when Cynthia dropped off the money. Smith told J.G., the amount paid for childcare would be based on the level of education and qualifications of the caretaker as well as the age of the child (the younger the child, the more that is paid). J.G. testified that the payment was once a month for about $1,300, and Cynthia and Smith would then divide the money between them as they agreed to do for that month. According to J.G., "[s]ome months [Smith] would receive all of it" and "sometimes she would give [him] some."

J.G. did not know that Smith worked as a nanny for Montoya from February 2017 through January 2018. He never saw Smith watching Montoya's children during that period. J.G. did not know anyone by the name Emma.

Following the fraud referrals and investigation, the county determined that Smith was ineligible for travel reimbursement and childcare for the period of February 2017 through January 2018, resulting in overpayment of $4,829.40 in travel reimbursement, $87 for LiveScan, and $29,497.44 for childcare benefits. The total amount of overpayment was $34,413.84.

Defense

Smith called several witnesses in her defense. Susie T. testified that the fraud investigator lied about her statement that Smith "never did community services." She admitted she had asked the investigator to send

12

her an email with Smith's community service forms, although she claimed she did not look at the email. Susie T. reiterated that Smith did community service at the church, including cleaning and setting up and taking down equipment for events. Susie T. had seen Smith at the church on Sundays and certain Wednesdays. The Church's regular business hours were 7:00 a.m. until 3:00 p.m., but it was open, at times, for evening service as well. During the usual business hours, "[t]he doors could be locked with a padlock if someone was there and they didn't want the door open because they could use the rear exit to enter and exit the building." The back door was on the side of the church. Susie T. also testified that Lee, another church employee who was authorized to sign community service forms, "would more than likely sign his name, because [he and Susie T.] worked hand in hand doing the community service." Smith's community service form for June 2017 was initialed with "LJ."

Montoya testified that the fraud investigator did not ask her if she employed Smith as a nanny when he initially spoke to her. Montoya refused to speak to him again because he had lied about what she said. Montoya testified that there were instances in 2017 when Smith took Montoya's child with Smith while Smith ran errands. Although Montoya initially indicated she did not tell the fraud investigator that she gave Smith authorization to sign for her, she subsequently clarified that she did give Smith authorization and that she had been confused when she denied it.

Cynthia testified that she never gave any money she had received from the county to Smith. According to Cynthia, Smith was in a relationship with Kevin in 2007 when they moved to Las Vegas together. As for her activities at the church, Smith ran errands and was "part of the put-up and break-down committee" on Wednesdays. When Cynthia ran errands with Smith,

13

Smith's children would come with them and they went to downtown Los Angeles on a Saturday and "Michaels in Rancho" on a Wednesday. Another time, they went to Redlands after bible study. Cleaning, running errands, or "anything that you do for the church" was community service.

Lastly, Smith took the stand and testified that J.G. was inaccurate when he claimed she started living with him in 2006. Smith was with Kevin in 2007 and moved with him to Las Vegas. Smith met J.G. in February 2009, started dating him in 2010, and moved in with him after she had their daughter in January 2014. Smith lived with J.G. starting in 2014, in Upland and Rancho Cucamonga, until she served J.G. with custody papers and he moved out in early 2016. She filed for custody of their children in February 2017.

Smith applied for CalWorks in 2016 and was required to participate in the Welfare-to-Work program. She did not recall the Welfare-to-Work contract with the date September 6, 2016; however, she admitted she signed that document, which listed her employers as Emma and Montoya As part of the Welfare-to-Work program, Smith completed semiannual reports. She admitted she signed the report dated May 8, 2017 and "familiar" pages dated October 30, 2017 that were used for CalFresh and cash aid. She also admitted signing the Welfare-to-Work contract dated June 5, 2017 and that she met the specialist who reviewed her employment; the form indicated, "employment Emma . . . and Montoya . . . as entered through the system." She admitted signing another Welfare-to-Work contract on December 15, 2017 but did not recall meeting the specialist at that time. She admitted signing another Welfare-to-Work contract dated January 30, 2018. Both contracts indicated Emma and Montoya as her employers. Smith testified the specialists "usually don't" go over every page with her.

14

The specialists only asked her "if [her] employment was the same," to which she confirmed it was the same. Smith denied signing her community service forms and telling the fraud investigator she had signed them. Instead, "[t[here were other community service supervisors, for lack of a better word, that were authorized to sign on [Susie B.'s] behalf." Smith admitted she signed the employment certification forms for February 2017 through January 2018 but did not recall the pages with Montoya's signature.

Smith watched Montoya's children at Montoya's "house in San Bernardino off of College" in January or February 2017. Smith testified that Emma was another church member whose granddaughters went to school with Smith's children. Smith listed Emma as a reference for her employment with Montoya because she "was told [she] needed to put her on there as well." After Montoya moved, Smith watched Montoya's child in Moreno Valley, Rialto, and Victorville. Smith did not recall when Montoya moved from the apartment on West College Avenue. She watched the child in Victorville at the end of 2017. In 2017, when she ran errands, she went to Rancho Cucamonga, Upland, Ontario, and possibly Fontana during which she took Montoya's child with her. She went to the stores in Rancho Cucamonga and Upland even when she was working in Rialto or San Bernardino because "[t]hat's the area [she was] familiar with, the stores [she was] familiar with." When asked about her failure to update Montoya's new address, Smith testified, "They just would have updated my paperwork. I don't think it would have made a difference in my case one way or the other. If the mileage was more, which it was, they would have paid me more money." Similarly, she was told she could have a more flexible schedule for her community service if she wanted it, but she did not make that request.

Smith's travel claims were "just for round trip work and community service, not for additional mileage"; she did not ask for additional mileage to go to Victorville. Smith understood that she was in compliance with her Welfare-to-Work contract if she "was within those 20 hours." She understood that she had to call "if the times changed" and "if the days changed," and she testified that she did call. Smith further testified that she "[p]robably" used her EBT card when she ran errands.

As for community service for the church, Smith had run errands for the church in 2017 and 2018, including with Cynthia. She might have used her EBT card while she ran the errands. In addition, some outreach programs for the church were done away from the church.

Rebuttal

The fraud investigator testified that he found a door on the side of the building where the church was located. The building also housed a costume store and a "home growing horticulture business." The building had "a number of back doors to the businesses next door and the business next door to that including large roll-up doors." When he knocked on the side door next to the utilities cage, no one answered the door. When he was asked whether he believed the side door "was to the church[,]" the investigator testified, "I knew it was part of the building. I could not tell from there when I went inside." The investigator "walked around that entire building and looked through the windows," and "there was nobody around" and no cars "anywhere near where the church would be." In contrast, there were many cars further down, in front of the costume store and by the horticulture business. The investigator testified he was not allowed to record his conversations with those he interviewed because of "federal rules of privacy for welfare recipients."

DISCUSSION

## I

## SMITH'S PRETRIAL STATEMENTS

### A. Smith's Contention

Smith claims the trial court erred when it admitted her pretrial interview with the welfare fraud investigator in violation of *Miranda*. Because we agree with the People that Smith was not in custody when she talked with a fraud investigator, there was no *Miranda* violation when the court admitted her statements.

### B. Background

Before trial, Smith moved to exclude her pretrial statements under *Miranda*. As such, the court held an Evidence Code section 402 hearing. At that hearing, the fraud investigator testified he interviewed Smith on the morning of March 21, 2018, at the welfare office. Smith was there to meet with a specialist. After their meeting, the specialist notified the investigator that Smith was at the office; the specialist was aware the investigator wanted to speak with Smith. The investigator had previously left Smith a voicemail about overpayment. Smith returned the investigator's call the previous day regarding the overpayment notice that she had received.

The fraud investigator brought Smith to an enclosed office about 10 feet from his cubicle "so she could have some privacy." The cubicle area where both the investigator and the specialist sit "is the open office where all public contact is done at the welfare office." The specialist's cubicle was about 15 feet from the investigator's cubicle. Smith's children were with her. The investigator had Smith sit by the door, which remained opened during the duration of their interview. He sat on the other side of the desk in the room. The investigator told Smith that she was free to leave at any time. Although

he was armed, the investigator's gun was covered and not visible. He was wearing "[n]ormal duty wear," which was "slacks and a pullover shirt"; the pullover shirt was oversized and covered his weapon, handcuffs, and cellphone.

The investigator first identified himself to Smith as a welfare fraud investigator before telling Smith that he "needed to talk to her about her case because there w[ere] issues with it." He then discussed her Welfare-to-Work program and reviewed documentation that she had signed as part of the program with her. He mostly asked Smith about her paperwork. He did not accuse Smith of any wrongdoing. The interview was approximately 25 minutes. The investigator did not use any force during the interview. He spoke in a calm and "normal quiet tone of voice." After he was done speaking with her, Smith left. At no time during his interview with Smith did the investigator provide a *Miranda* warning.

At the hearing, the prosecution argued no *Miranda* warning was required because there was no custodial interrogation based on circumstances of the interview. Smith's counsel argued the circumstances indicated that Smith was in custody and should have been advised of her *Miranda* rights. The trial court found Smith's pretrial statements were not obtained in violation of *Miranda* based on the circumstances of the interview.

C. Standard of Review and Applicable Law

Whether a defendant was in custody for *Miranda* purposes presents a mixed question of law and fact. We review the trial court's factual findings on the circumstances of the interrogation for substantial evidence and decide independently whether under the totality of the circumstances a reasonable person in the defendant's position would have felt free to stop the questioning

18

and leave.  (*People v. Kopatz* (2015) 61 Cal.4th 62, 80 (*Kopatz*); *In re I.F.* (2018) 20 Cal.App.5th 735, 760; *People v. Macklem* (2007) 149 Cal.App.4th 674, 695.)

Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."  (*Miranda*, *supra*, 384 U.S. at p. 444.)  "As used in [the] *Miranda* case law, 'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion."  (*Howes v. Fields* (2012) 565 U.S. 499, 508-509 (*Howes*).)  To constitute custody for *Miranda* purposes, there must be restraint on the person's freedom of movement in an "environment [that] presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*."  (*Howes*, at p. 509.)

The " 'circumstances of the interrogation,' " (*Howes*, *supra*, 565 U.S. at p. 509), include:  "whether contact with law enforcement was initiated by the police or the person interrogated, and if by the police, whether the person voluntarily agreed to an interview; whether the express purpose of the interview was to question the person as a witness or a suspect; where the interview took place; whether police informed the person that he or she was under arrest or in custody; whether they informed the person that he or she was free to terminate the interview and leave at any time and/or whether the person's conduct indicated an awareness of such freedom; whether there were restrictions on the person's freedom of movement during the interview; how long the interrogation lasted; how many police officers participated; whether they dominated and controlled the course of the interrogation; whether they manifested a belief that the person was culpable and they had evidence to prove it; whether the police were aggressive, confrontational, and/or

19

accusatory; whether the police used interrogation techniques to pressure the suspect; and whether the person was arrested at the end of the interrogation." (*People v. Aguilera* (1996) 51 Cal.App.4th 1151, 1162 .) "No one factor is dispositive. Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (*Ibid.*)

## D. Analysis

The parties agree that the primary issue before us is whether Smith was in custody while being questioned by the welfare fraud investigator.[4] Moreover, they do not appear to dispute findings of fact or credibility determinations. Indeed, the parties' respective descriptions of Smith's interaction with the fraud investigator are fairly similar. Therefore, we must independently determine whether the interrogation was "custodial," i.e., whether under the totality of the circumstances, "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation

---

[4] The Penal Code sets forth categories of peace officers, including "several catchall provisions that include some officers with narrow geographic responsibilities . . . and some with narrow 'clientele'—e.g., welfare-fraud or child-support investigators, correctional officers, parole and probation officers." (*Cabell v. Chavez-Salido* (1982) 454 U.S. 432, 443, citing §§ 830.31-830.6.) Specifically, section 830.35 provides in pertinent part, "The following persons are peace officers whose authority extends to any place in the state for the purpose of performing their primary duty . . . . [¶] (a) A welfare fraud investigator or inspector, regularly employed and paid in that capacity by a county, if the primary duty of the peace officer is the enforcement of the provisions of the Welfare and Institutions Code." Thus, for purposes of our analysis here, we treat the fraud investigator as a peace officer.

and leave." (*Thompson v. Keohane* (1995) 516 U.S. 99, 112 (*Thompson*); accord, *Kopatz, supra*, 61 Cal.4th at p. 80; see *People v. Torres* (2018) 25 Cal.App.5th 162, 173.)

Here, in the context of the challenged statements Smith made to the welfare fraud investigator, the factors weighing against a custodial finding predominate. Smith voluntarily agreed to be interviewed by the fraud investigator and followed him to the office with her children accompanying her. The investigator had Smith sit by the door, which remained opened during the duration of their interview, and the investigator sat on the other side of the desk in the room. And the investigator told Smith that she was free to leave at any time. Smith was not handcuffed or otherwise restrained.

The investigator first identified himself to Smith as a welfare fraud investigator before telling Smith that he "needed to talk to her about her case because" of some issues with it. He primarily asked Smith about her paperwork for the Welfare-to-Work program and did not accuse her of any wrongdoing. Moreover, the investigator was neither aggressive nor confrontational. Indeed, he spoke in a calm manner, using a "normal quiet tone of voice." In addition, the investigator did not use interrogation techniques to pressure Smith. The interview lasted about 25 minutes, and the investigator did not arrest Smith at the end of the interview.

The investigator was the only person talking with Smith in the open room. Although he was armed, the investigator's gun was covered and not visible. Further, he was wearing "[n]ormal duty wear," which was "slacks and a pullover shirt"; the pullover shirt was oversized and covered his weapon, handcuffs, and cellphone.

Despite the multitude of factors supporting the conclusion that Smith was not in custody while being questioned by the welfare fraud investigator,

21

she still insists she was in custody and required a *Miranda* warning. To this end, she argues that anyone in her position, who was being questioned by a fraud investigator and was accompanied by her small children would not feel free to leave the interview. Smith further maintains that anyone in her situation would not have known if the investigator "would attempt to detain her in some fashion that would instill fear in the children." In this sense, Smith appears to be arguing that the fact that she was questioned by a fraud investigator in the presence of her young children is sufficient to overcome the other factors that clearly cut against a finding that she was in custody. Yet, Smith provides no authority that supports her position. Also, Smith's suggested analysis calls for us to ignore several factors that indicate she was not in custody. On the record before us, we find no compelling reason to ignore those factors.

In summary, when all the above factors are viewed together, we conclude that under the totality of the circumstances the interrogation of Smith was not custodial. Accordingly, the trial court did not err in denying Smith's motion to suppress the challenged statements.

## II

## SUBSTANTIAL EVIDENCE

### A. Smith's Contentions

Smith contends the prosecution failed to present sufficient evidence to support the jury's guilty verdicts on count 1, aid by misrepresentation in an amount of $900 (Welf. & Inst. Code, § 10980, subd. (c)(2)), and counts 2 through 96 for perjury by declaration (§ 118). We disagree.

### B. Standard of Review

We review challenges to the sufficiency of the evidence for substantial evidence. (*People v. San Nicolas* (2004) 34 Cal.4th 614, 658 ["A judgment will

not be reversed so long as there is substantial evidence to support a rational trier of fact's conclusion . . . ."]; see *People v. Gregerson* (2011) 202 Cal.App.4th 306, 320.) In so doing, we examine the entire record in the light most favorable to the judgment below. (*People v. Becerrada* (2017) 2 Cal.5th 1009, 1028 (*Becerrada*).) We look for substantial evidence, which is evidence that is "reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1078; *People v. Banks* (2015) 61 Cal.4th 788, 804), and we do not substitute our own factual determinations for the factfinder's. (*Koontz*, at p. 1078.) Further, " '[w]e do not reweigh evidence or reevaluate a witness's credibility.' [Citations.] 'Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support [a trial court's factual finding].' " (*People v. Brown* (2014) 59 Cal.4th 86, 106 (*Brown*).)

## C. Analysis

Smith was convicted in count 1 of obtaining or retaining public assistance, or aid, by misrepresentation, in violation of subdivision (c)(2) of section 10980 of the Welfare and Institutions Code. The statute is violated, "Whenever any person has, willfully and knowingly, with the intent to deceive, by means of false statement or representation, or by failing to disclose a material fact . . . obtained or retained aid under the provisions of this division [(Welf & Inst. Code, § 10000 et. seq.)] for himself or herself or for a child not in fact entitled thereto," in an amount over $950. (Welf. & Inst. Code, § 10980, subd. (c)(2).)

Smith also was convicted of 95 counts of perjury. "The elements of perjury are: 'a "willful statement, under oath, of any material matter which the witness knows to be false." ' " (*People v. Garcia* (2006) 39 Cal.4th 1070, 1091.)

As the People point out, the prosecutor's theory of the case focused on a false statement/representation type of welfare fraud. To this end, the jury was instructed consistent with this theory: "The People allege that the defendant made the following false statement or false representation that: on or about February 1, 2017 through and including January 31, 2018, Terin Smith claimed she was working and doing community service in order to claim for Welfare[-]to[-]Work Travel Assistance benefits and County Paid Child Care Service benefits not in fact entitled, in the amount of $34,413.84." In addition, the prosecutor argued that Smith "willfully and knowingly made a false statement or representation." Essentially, the prosecutor maintained that Smith lied about her employment, community service, and the childcare she was receiving. Further, the prosecutor explicitly stated that, although welfare fraud "can also be done by impersonation or other fraudulent device or a failure to disclose the material fact . . . those . . . other ways . . . do[ ] not apply in this particular case."

Similarly, for the perjury counts, the jury was instructed and the prosecutor argued that Smith "claimed to be working" and/or "doing community service" under penalty of perjury to obtain travel and childcare benefits. The prosecutor noted that counts 2 through 14 pertained to Smith's records of employment, counts 15 through 26 pertained to her travel assistance forms, and counts 27 through 96 pertained to her childcare forms.

In challenging the sufficiency of the evidence here, Smith largely ignores the prosecutor's theory of the case and focuses on her admitted failure

to indicate in her documents for the Welfare-to-Work program that her place of employment changed. Further, she notes that her alleged new location of employment took her "a distance further than" the listed employment location. Therefore, Smith claims "it becomes questionable if the failure to report the change in employment location constituted a material fact which was committed knowingly with the specific intent to deceive or defraud." In this sense, she implies that the only misrepresentation the prosecution proved at trial actually benefited the Welfare-to-Work program because she was not provided a larger amount of transportation assistance.

In addition, Smith insists that the prosecution's theory of the case was refuted by witnesses responsible for reporting Smith's employment and community service. Indeed, Smith discusses various witnesses' testimony and explains how that testimony supports her version of events and undercuts the prosecution's case against her. And she draws inferences from this testimony to support her defense. Yet, these types of arguments are not proper when an appellant challenges the sufficiency of the evidence. In such a challenge, we do not review the evidence in a light most favorable to the defense. As we discuss *ante*, we must look at the entire record in the light most favorable to the judgment. (*Becerrada*, *supra*, 2 Cal.5th at p. 1028.) Here, Smith does not address any of the evidence that supports the jury's verdict.

Below, the evidence showed that Smith's Welfare-to-Work contracts indicated she worked at least 18 hours a week for Montoya and Emma at Montoya's apartment on West College Avenue in San Bernardino. Yet, Montoya told the fraud investigator that she did not employ Smith as a nanny, Smith had only watched her children 10 to 20 times "as a favor" at the apartment on West College Avenue, and she had never paid Smith to watch

her children. Montoya and her apartment manager confirmed that Montoya moved out of the West College Avenue apartment on January 26, 2017. And it was undisputed that Smith never informed any specialist or updated her forms to reflect that she was not working at the apartment on West College Avenue. Although Smith suggests that her failure to change her work address is immaterial, the jury could have reasonably viewed Smith's failure to accurately list the location of her employment as additional evidence supporting the prosecution's theory that she was lying about working and participating in community service.

In addition, Montoya told the fraud investigator and testified at trial that she did not sign the employment forms that Smith had submitted to the county. Montoya did not know anyone named Emma, even though Smith indicated on her contracts that Montoya and Emma were both her employers at the same address. Further, J.G. testified that, to his knowledge, Smith did not work as a nanny for Montoya during the alleged time period, and he never saw her watching Montoya's children during that time. In addition, J.G. testified that he saw Cynthia give Smith childcare money Cynthia had been paid to allegedly watch Smith's children. Moreover, during times Smith represented she was working in San Bernardino, Smith had EBT transactions in Rancho Cucamonga, Upland, and Ontario.

There also was substantial evidence that Smith was not performing community service as indicated in her Welfare-to-Work contracts and community service forms. Although she agreed to do a total of two hours of community service at the church in San Bernardino over the course of the week, occurring between 8:00 p.m. to 9:00 p.m., Monday through Friday, Smith's submitted community service forms indicating she was cleaning the church every Wednesday and Saturday. In particular, Smith submitted a

26

form for January 2018 wherein she stated she did community service every Wednesday from 11:30 a.m. to 5:15 p.m. of that month. However, when the fraud investigator went to the church on a Wednesday in late January 2018 between 11:00 a.m. and 12:00 p.m. (a time she represented she was at the church) neither Smith nor anyone else was there. The front doors were closed with a large chain and padlock, and no one came to the door when the investigator knocked. Moreover, that Smith was not typically at church on a Wednesday is supported by J.G.'s testimony that the "[m]ajority of the time," he took her to church on a Sunday.

In addition, Susie T. told the fraud investigator she could not remember the last time she completed a community service form for Smith. Susie T. told the investigator that she went by Susie T. in 2017 and 2018, despite the "Susie B[.]" signatures and "SB" initials on Smith's forms. At trial, Susie T. testified she did not sign Smith's community service forms, she was not present when the forms were signed, and she was only present at the church on Saturdays and Sundays. Smith also had EBT transactions in Upland, Rancho Cucamonga, and Ontario during times she represented she was doing community service in San Bernardino.

Smith does not address how the evidence above, as well as other evidence offered by the prosecution, does not support the jury's verdict. Rather, she asks this court to only consider the portions of certain witnesses' testimony that supports her defense. In doing so, she is asking us to reweigh

the evidence and determine credibility.[5]  This is not our role in a substantial evidence review.  (*Brown*, *supra*, 59 Cal.4th at p. 106.)

In short, on the record before us, substantial evidence supports the jury's verdicts on all counts.

## III

## PROSECUTORIAL MISCONDUCT

### A.  Smith's Contentions

Smith maintains the trial court committed reversable error by denying her motion for a new trial based on prosecutorial misconduct.  We disagree.

### B.  Background

Among other instructions, the court instructed the jury with a modified version of CALCRIM No. 220, which provided in relevant part:  "Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true.  The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt."  In addition, the court provided the jury with a modified version of CALCRIM No. 222, which provided in pertinent part:  "Nothing that the attorneys say is evidence.  In their opening statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence.  Their questions are not evidence.  Only the witnesses' answers are evidence."

During closing argument, the prosecutor stated:

---

[5]     Nowhere is Smith's argument that we should disregard and/or reweigh the evidence more apparent than her discussion of J.G.'s testimony.  She implores this court to view J.G.'s testimony skeptically, detailing why he should be deemed an untrustworthy person.  Again, such an argument is not proper before us.  "[I]t is the exclusive province of the trial judge or jury to determine the credibility of a witness. . . .  We [do not] resolve . . . credibility issues. . . .  [Citation.]"  (*People v. Harris* (2013) 57 Cal.4th 804, 849.)

28

> "I know you're all human and we all have emotions. Okay?
> Some of you may feel sorry for the defendant and that's
> okay, but, ladies and gentlemen, the instructions and the
> law tells you do not let your personal biases, sympathy or
> prejudice or public opinion influence your decision. The
> defense would like your emotion to get in the way. Would
> like to muddy the fact—"

Defense counsel objected to this portion of the prosecutor's closing argument, but the court overruled the objection, noting the prosecutor was engaging in argument.

During her rebuttal closing argument, the prosecutor repeated, "As I mentioned earlier in my closing, I said the defense's intents were going to be to muddy the water." Smith's counsel did not object.

Also during her rebuttal closing argument, the prosecutor discussed the burden of proof as follows: "CALCRIM 220, proof beyond a reasonable doubt is proof that leaves you with an abiding conviction, firm belief." Smith's counsel objected and asked to approach the bench. The court merely replied, "No," and told the prosecutor that she could continue with her closing argument.

Before the jury began deliberations, the trial court reminded the jury:

> "I want to emphasize what I told you before, what you
> heard from counsel in their closing arguments are exactly
> that, arguments. There is no evidence about anything with
> respect to what counsel said. The evidence came from the
> witness stand and exhibits, from what you heard here in
> court from the witnesses."

The court also addressed the burden of proof, reminding the jurors that "both counsel discussed the burden of proof in this case. So it's clear, you're going to follow my instructions or the law which I gave you pertaining to this case, the jury instructions, and again, the standard of proof here is beyond a reasonable doubt. That is defined in Instruction 220."

29

The jury convicted Smith on all counts. Smith filed a motion for a new trial, arguing, among other things, that the prosecutor's "muddy the facts" comments and alleged misstatement of the burden of proof ("firm belief") constituted prosecutorial misconduct. The court denied Smith's motion, explaining that the issues raised in the motion were addressed during trial. As such, the court pointed out that the "muddying the waters" comment was just argument, the court told the jury that comments by either attorney were "only argument" with no evidentiary value, and the court reinstructed the jury with CALCRIM No. 220 after the closing arguments had concluded.

## C. Standard of Review

In general, "[w]e review a trial court's ruling on a motion for a new trial under a deferential abuse-of-discretion standard." (*People v. Navarette* (2003) 30 Cal.4th 458, 526.) "The trial court's factual findings, express or implied, will be upheld if supported by any substantial evidence." (*People v. Dickens* (2005) 130 Cal.App.4th 1245, 1252.)

Citing *People v. Ault* (2004) 33 Cal.4th 1250 (*Ault*), Smith argues the standard of review for an order denying a motion for a new trial is de novo. In *Ault*, the Supreme Court concluded an order granting a criminal defendant's motion for a new trial based on prejudicial juror misconduct is reviewed under an abuse of discretion standard. (*Id*. at p. 1255.) In contrast, an order denying such a motion is subject to independent review. (*Ibid*., citing *People v. Nesler* (1997) 16 Cal.4th 561.) The court in *Ault* expressly limited this standard of review to the trial court's finding of prejudice resulting from juror misconduct. (*Ault*, at p. 1267, fn. 9; see *People v. Collins* (2010) 49 Cal.4th 175, 242, fn. 31.) California Supreme Court cases since *Ault* have applied the abuse of discretion standard to the review of orders

30

denying a criminal defendant's motion for a new trial. (E.g., *People v. Guerra* (2006) 37 Cal.4th 1067, 1159-1160; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 127-128.)

However, in the instant action, we need not determine the precise standard of review to apply to Smith's claim because the claim fails under any standard, for the reasons stated below.

### D.  Analysis

Smith based her motion for new trial, in part, on portions of the prosecutor's closing argument.  She claims the prosecutor disparaged defense counsel and distorted the burden of proof.  Because Smith's argument here depends upon the existence of prosecutorial misconduct, we look first to her claims that prosecutor committed misconduct during closing argument.

As our Supreme Court has stated, the term " ' "misconduct" ' " is inapt to the extent it suggests the claim of error only applies when the prosecutor acts " 'with a culpable state of mind.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 666-667.)  " 'A more apt description of the transgression is prosecutorial error.' " (*Id.* at p. 667.)  "Such error occurs, as a matter of state law, when a prosecutor 'engage[s] in deceptive or reprehensible tactics in order to persuade the trier of fact to convict.' [Citation.]  Federal constitutional error occurs only when the prosecutor's actions 'comprise a pattern of conduct that is serious and egregious, such that the trial is rendered so unfair that the resulting conviction violates the defendant's right to due process of law.' [Citation.]  'In order to be entitled to relief under state law, defendant must show that the challenged conduct raised a reasonable likelihood of a more favorable verdict.' [Citation.]  Under federal law, relief is not available if 'the challenged conduct was . . . harmless beyond a reasonable doubt.' " (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 854.)

"A criminal prosecutor has much latitude when making a closing argument. Her argument may be strongly worded and vigorous so long as it fairly comments on the evidence admitted at trial or asks the jury to draw reasonable inferences and deductions from that evidence." (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1330.) The prosecutor errs when he or she mischaracterizes the evidence. (*People v. Hill* (1998) 17 Cal.4th 800, 823.) However, a prosecutor may "use appropriate epithets. . . ." (*People v. Stanley* (2006) 39 Cal.4th 913, 952 (*Stanley*).) Thus, a prosecutor may characterize defense evidence and witnesses as unbelievable or incredible. (See, e.g., *People v. Marquez* (1992) 1 Cal.4th 553, 575-576 (*Marquez*).) But a prosecutor may not disparage defense counsel personally, because that directs the jury's attention away from the evidence, and a defendant's conviction should be based on the evidence and not on the "purported improprieties" of his counsel. (*People v. Frye* (1998) 18 Cal.4th 894, 978.)

In *Stanley*, *supra*, 39 Cal.4th at page 952, our high court found no misconduct when a prosecutor told the jury that defense counsel " 'imagined things that go beyond the evidence' and told them a 'bald-faced lie.' " The court reasoned that the prosecutor's remarks were merely responsive to defense counsel's own arguments to the jury on the state of the evidence and that his remarks, "although intemperate in tone, did little more than urge the jury not to be influenced by counsel's arguments, and to instead focus on the testimony and evidence in the case." (*Ibid.*)

Similarly, the California Supreme Court has concluded other comments made during closing referring to the defense did not impermissibly impugn defense counsel. For example, the court was not troubled by the following comments by a prosecutor: " 'They [defense counsel] are extremely fine. And what is their job? Their job is to create straw men. Their job is to put up

32

smoke, red herrings.  And they have done a heck of a good job.  And my job is to straighten that out and show you where the truth lies.  So let's do that.' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 1002.)  Noting that defense counsel had failed to object to the comment, the court concluded "the prosecutor's comments [were] not so extreme that an admonition would not have cured any harm." (*Ibid*.)  Moreover, even after finding wavier, the court nevertheless determined that there was no reasonable likelihood that the jury was improperly influenced by the prosecutor's remarks.  (*Ibid*.)

In *Marquez, supra,* 1 Cal.4th at pages 575 through 576, the California Supreme Court concluded the prosecutor's comments, that a " 'heavy, heavy smokescreen has been laid down [by the defense] to hide the truth from you' " constituted a "proper argument against the jury's acceptance of the defense presented."  Further, our high court found that the prosecutor's argument accusing the defense of attempting to hide the truth, and his argument employing an "ink from an octopus" metaphor, would be understood as nothing more than urging the jury not to be misled by the evidence.[6] (*Cummings, supra*, 4 Cal.4th at p. 1302.)

Here, the prosecutor's comments that the defense tried to "muddy the facts" and "muddy the waters" are akin to the comments our high court found acceptable in *Stanley*, *Cunningham*, and *Marquez*.  Further, we find the comments the prosecutor uttered here to be less severe than the comments in

---

[6]     The court noted that defense counsel's objection and the court's admonition that it was certain the prosecutor was not trying to impugn the integrity of any parties of the proceeding cured any potential problems with the prosecutor's comments suggestion deception.  In addition, after the objection and the admonition, the prosecutor again accused the defense of attempting to hide the truth and used the octopus metaphor several times without any objection from the defense.  (*People v. Cummings* (1993) 4 Cal.4th 1233, 1302 (*Cummings*).)

those other cases. And the prosecutor's comments in the instant action did not disparage Smith's counsel or personally attack him. Considering the context in which the prosecutor made the challenged comments, it appears she was reminding the jury to follow the evidence and not to ignore the facts based on emotion. Such a reminder is proper during closing argument. (See *Cunningham*, *supra*, 25 Cal.4th at p. 1002; *Marquez*, *supra*, 1 Cal.4th at pp. 575-576.)

In addition, although the court overruled defense counsel's objection to the prosecutor's first "muddy the facts" comment by noting that the comment was merely argument, the court subsequently reminded the jury that it had been instructed with CALCRIM No. 222 and that nothing the attorneys said during closing argument was evidence.

Likewise, we are not troubled by the prosecutor using the expression "firm belief" when discussing reasonable doubt during closing argument. CALCRIM No. 220 defines proof beyond a reasonable doubt as "proof that leaves you with an abiding conviction that the charge is true. The evidence need not eliminate all possible doubt because everything in life is open to some possible or imaginary doubt." "Abiding" means "[l]asting for a long time; enduring." (American Heritage Dict. (5th ed. 2016) p. 3, col. 2; see also Merriam-Webster Collegiate Dict. (11th ed. 2006) p. 2, col. 2 ["enduring, continuing"]. A "conviction" is "[a] fixed or strong belief." (American Heritage Dict. (5th ed. 2016) p. 402, col. 1; see also Merriam-Webster Collegiate Dict. (11th ed. 2006) p. 274, col. 1 ["a strong persuasion or belief"].) "Firm" means "[n]ot subject to change; fixed and definite." (American Heritage Dict. (5th ed. 2016) p. 662, col. 2; see also Merriam-Webster Collegiate Dict. (11th ed. 2006) p. 471, col. 2 ["not subject to change or revision"].) A "belief" is a "[m]ental acceptance of and conviction in the truth,

34

actuality, or validity of something," or "[s]omething believed or accepted as true." (American Heritage Dict. (5th ed. 2016) p. 164, col. 2; see also Merriam-Webster Collegiate Dict. (11th ed. 2006) p. 111, col. 2 ["something believed"; a "conviction of the truth of some statement or the reality of some being or phenomenon"].) Thus, the prosecutor's use of the phrase "firm conviction" in connection with reasonable doubt was not improper. Moreover, we agree with the People that the prosecutor's use of that phrase was consistent with the description of " 'an abiding conviction' as one that is 'settled and fixed' and one that is 'lasting [and] permanent.' " (*People v. Pierce* (2009) 172 Cal.App.4th 567, 573, quoting *Hopt v. Utah* (1887) 120 U.S. 430, 339, and *People v. Brigham* (1979) 25 Cal.3d 283, 290.)

In short, we do not find the prosecutor's statements during closing argument about muddying the facts/waters or firm belief as rising to the level of prosecutorial misconduct. Further, even if those comments did constitute misconduct, on the record before us, there is no " ' "reasonable likelihood that the jury construed or applied any of the complained-of-remarks in an objectionable fashion." ' " (*People v. Friend* (2009) 47 Cal.4th 1, 29.) The challenged remarks were brief, the prosecutor specifically referenced CALCRIM No. 220 when she made the "firm belief" comment, the jury was instructed with CALCRIM Nos. 220 and 222, and, after closing, the court reminded the jury that nothing the attorneys said during closing argument was evidence. Moreover, the court told the jury that it must follow the court's instructions.

On the record before us, Smith's claim of prosecutorial misconduct lacks merit. Because that is the only ground on which she relies to claim the trial court erred in denying her motion for new trial, we conclude her challenge here to that ruling must fail.

IV

SECTION 654

A. Smith's Contentions

Smith argues the trial court violated section 654 when it sentenced her to concurrent terms on counts 2 through 96. The People counter that this issue is not yet ripe because the court suspended imposition of Smith's sentence when it placed her on felony probation. The People have the better argument.

B. Background

The probation report recommended "that pronouncement of judgment be withheld for the offense of Fraud to Obtain Aid Over $400, in violation of Section 10980(c)(2) of the Welfare and Institution Code, a Felony, (Count 1) and Perjury by Declaration, in violation of Sections 118 of the Penal Code, a Felony (Count 2 through Count 96); and the defendant, Terin Smith, be granted supervised probation for a period of five (5) years under" certain terms and conditions, including serving 180 days in county jail.

At the sentencing hearing, the prosecutor began by pointing out that Smith's "maximum exposure" for her crimes was "97 years in County Prison." However, the prosecutor recommended 34 years instead. Moreover, she noted that Smith had paid the full restitution amount. In response, Smith's counsel began with a discussion of whether section 654 applied to Smith's offenses. Arguing that section 654 did apply, defense counsel emphasized that the prosecutor's "overall . . . theory of the case at trial" was "clearly a continuous course of conduct[.]" Although Smith's counsel argued against the imposition of any prison time, he contended if the court believed that confinement was appropriate, then it should impose less than 60 days because Smith had paid the entire restitution.

36

After the parties submitted on the sentencing issue, the trial court initially indicated that it would sentence Smith to 365 days: "[T]he Court will sentence Ms. Smith to 365 days" on count 1 and 95 concurrent 365-day terms for counts 2 through 96. In addition, the court stated that "it [did] not find any [section] 654 issues at this time," and then, in addressing counts 3 through 96, the court stated it was "impos[ing] 365 days to run concurrent to Counts 1 and 2." However, the court, then went off the record where a discussion was held. When the court came back on the record, Smith's counsel stated, "I would object to that. I don't think that's correct, but I would have to look at that again." The record does not illuminate to what defense counsel was objecting, but, immediately after counsel lodged the objection, the court stated, "Counsel, what I'll do is place Ms. Smith on a term of five years felony probation subject to modification." The court then indicated probation was "under the following terms and conditions: Term 1, serve 365 days in county jail, credit 2 days with 4019 credits, allow Ms. Smith to do the time on weekends." The court reiterated that sentence as follows:

> "So I understand the terms that—well, Ms. Smith, can you stand for me, ma'am. The Court is going to follow—impose the following terms, I'm doing [sic] to place you on felony probation for a period of five years under the following terms; serve 365 days in county jail, credit 2 days, that's with new 4019 credits."

In a subsequent hearing, the court reduced the term of probation to three years in light of Smith's payment of restitution.

The sentencing minute order indicates the trial court granted felony probation on count 1 with 365 days in county jail and also indicates the court granted felony probation on counts 3 through 96 but listed concurrent 365-day terms for counts 2 through 96.

37

## C. Analysis

"In granting probation, a trial court may either suspend the imposition of sentence or impose sentence and suspend its execution." (*People v. Medina* (2001) 89 Cal.App.4th 318, 321.) There is a difference between suspension of imposition of sentence, and suspension of execution of sentence; and the law "explicitly sets out two different sentencing rules for these distinct situations." (*People v. Howard* (1997) 16 Cal.4th 1081, 1094; compare Pen. Code, §§ 1203, subd. (a), 1203.1, subd. (a), 1203.2, subd. (c) and Cal. Rules of Court, rule 4.435(b).) When the imposition of sentence is suspended, the court, upon revocation of probation, has full discretion to choose from the sentencing options originally available. Simply stated, sentencing is deferred until the time when probation is revoked. (*Howard*, at p. 1087.) In contrast, when the court orders suspension of the execution of sentence, the court sentences a defendant to a prison term but only applies that sentence when probation is revoked. (*Ibid.*) In the latter case, the court has no discretion to increase or decrease the sentence.

When imposition of sentence is suspended, a section 654 argument is not ripe unless and until a sentence is imposed after revocation of probation. (See *People v. Martinez* (2017) 15 Cal.App.5th 659, 669 (*Martinez*).) "Because sentence was not imposed . . . , there is no double punishment issue." (*People v. Wittig* (1984) 158 Cal.App.3d 124, 137.)

When suspending execution of a sentence, however, different rules apply. A sentence is imposed; only its execution is suspended. The court is required to consider whether any sentences run consecutively or concurrently (Cal. Rules of Court, rule 4.433(c)(3)) and determine whether section 654 requires a stay (Cal. Rules of Court, rule 4.424). If the court imposes a

sentence but suspends its execution, then a section 654 challenge to the sentence is ripe for consideration.

Here, the parties disagree about whether the court suspended the imposition or the execution of the sentence. Although they acknowledge the record is less than clear, the People argue the trial court did not impose any sentence but instead, the county jail "sentence" the court mentioned was meant to be a condition of probation. Smith, however, points out that if a trial court is going to suspend the imposition of the sentence, it did not need to address section 654. Yet, here, the trial court specifically mentioned section 654 and stated that it "[did] not find any [section] 654 issues at this time[.]" Because the court explicitly addressed the section 654 issue, Smith maintains the court imposed a sentence and suspended the execution. As such, according to Smith, the section 654 issue is ripe.

We agree that the record is not a model of clarity regarding whether the court suspended the imposition or execution of Smith's sentence. Indeed, at first blush, it appears that the court was going to impose a sentence on Smith and began to do so. But then the court went off the record, and when it returned, it imposed probation on Smith. Moreover, it repeated what it was doing, explaining that it was imposing probation, which included the condition that Smith serve 365 days in county jail. Thus, the court appeared to not have imposed any sentence. Rather, it imposed probation.

In addition, the court's brief discussion of section 654 does not alter our view of the record. The court stated that it did not find any section 654 issues "at this time." Including the prepositional phrase, "at this time," at the end of its fleeting mention of section 654, suggests that it could consider the issue at a later time. The only later time the trial court would have occasion to consider section 654 would be if it was sentencing Smith if probation was

revoked, and the court needed to sentence Smith to jail or prison. Therefore, we read the court's mention of finding no section 654 issue at this time as further support for the People's contention that the court did not impose any sentence on Smith. It imposed probation. Consequently, Smith's section 654 challenge is not yet ripe. (See *Martinez, supra*, 15 Cal.App.5th at p. 669.)

## V

## ASSEMBLY BILL NO. 1950

The Legislature enacted Assembly Bill No. 1950, which amended section 1203.1. (Stats. 2020, ch. 328, § 2.) Subject to exceptions not applicable here, section 1203.1, subdivision (a), as amended, provides that a felony probation term cannot exceed two years. (*People v. Czirban* (2021) 67 Cal.App.5th 1073, 1095 (*Czirban*).) Assembly Bill No. 1950 went into effect on January 1, 2021, and applies to Smith who was sentenced on February 26, 2021.

Despite acknowledging the new legislation, the trial court nonetheless imposed an initial term of probation of five years. As the parties agree, this was error. As for the remedy that should follow from the current two-year limitation in section 1203.1, both Smith and the People contend that we should remand the matter so the trial court can modify Smith's probation. We concur. (See *Czirban, supra*, 67 Cal.App.5th at 1095; *People v. Lord* (2021) 64 Cal.App.5th 241, 245-246.) Thus, we will reverse the order of probation and remand the matter to the trial court for resentencing to modify Smith's probationary term in accordance with current Penal Code section 1203.1, subdivision (a).

## VI

## ASSEMBLY BILL NO. 1869

Smith argues the appointed counsel, presentence investigation and report, and probation supervision fees should be "stricken, with the trial court directed to vacate any portion of the judgment ordering collection of any unpaid debt related to these fees." The People agree that as of July 1, 2021, any unpaid portion of the challenged fees is uncollectable and must be vacated.

At sentencing, the trial court ordered Smith to pay the following, in pertinent part: $750 in appointed counsel fees;[7] a reduced $250 for the presentence investigation and report (§ 1203.1b); and, $29 per month for probation supervision (§ 1203.1b). The court set the payment schedule for all fines and fees at $45 per month.

In 2020, the Legislature passed Assembly Bill No. 1869 (2019-2020 Reg. Sess.) to "eliminate the range of administrative fees that agencies and courts are authorized to impose to fund elements of the criminal legal system." (Assem. Bill No. 1869 (2019-2020 Reg. Sess.) § 2, eff. Sept. 18, 2020, operative July 1, 2021.) Relevant here, Assembly Bill No, 1869 added Penal Code section 1465.9 and Government Code section 6111. Both provisions became effective on July 1, 2021. (§ 1465.9, subd. (b); Gov. Code, § 6111, subd. (b).) Section 1465.9, subdivision (a), provides, "the balance of any court-imposed costs pursuant to Section 987.4, subdivision (a) of

---

[7] The minute order indicated that the trial court ordered $700 for counsel fees. However, the reporter's transcript states that court order $750. " 'Where there is a discrepancy between the oral pronouncement of judgment and the minute order or abstract of judgment, the oral pronouncement controls.' " (*People v. Clark* (2021) 67 Cal.App.5th 248, 260-261 (*Clark*), quoting *People v. Zackery* (2007) 147 Cal.App.4th 380, 385.)

Section 987.5, Sections 987.8, 1203, 1203.1e, 1203.016, 1203.018, 1203.1b, 1208.2, 1210.15, 3010.8, 4024.2, and 6266, as those sections read on June 30, 2021, shall be unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." Before Assembly Bill No. 1869, the provisions listed in section 1465.9 permitted trial courts to impose (among other things) appointed attorney fees and probation-related costs.

Similarly, newly-enacted Government Code section 6111 provides that specified fees including "any court-imposed costs pursuant to Section 27712" are likewise "unenforceable and uncollectible and any portion of a judgment imposing those costs shall be vacated." (Gov. Code, § 6111, subd. (a).) Former Government Code section 27712 provided for the cost of legal assistance from a "public defender or private counsel appointed by the court."

The plain language of the newly-enacted statutes dictates that any remaining unpaid balance of the probation costs and appointed attorney fee is now unenforceable, uncollectible, and the portion of the judgment imposing such costs must be vacated. (Pen. Code, § 1465.9; Gov. Code, § 6111, subd. (a); *Clark*, *supra*, 67 Cal.App.5th at p. 260 [vacating unpaid balance of probation supervision fee and "Criminal Violation Distribution" fine]; *People v. Greeley* (2021) 70 Cal.App.5th 609, 625-627 [vacating unpaid balance of criminal justice administration fee and the probation supervision fee].)

## DISPOSITION

The order of probation is reversed, and the matter is remanded to the trial court for resentencing with directions to modify Smith's term of probation in accord with Penal Code section 1203.1, subdivision (a), as amended by Assembly Bill No. 1950 (2019-2020 Reg. Sess.). The trial court

also is directed to vacate the portion of the judgment imposing the probation costs and appointed attorney fee.  In all other respects, the judgment is affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

O'ROURKE, J.

IRION, J.